IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CONSTANTIN VATA, | ) | CASE NO. 1:11-CV-1700 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Constantin Vata ("Plaintiff" or "Vata") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). On November 14, 2011, Plaintiff filed his Brief on the Merits.  Doc. 14.  On December 14, 2011, Defendant filed its Brief.  Doc. 16.  Thereafter, on February 24, 2012, Plaintiff, as a "reply" to Defendant's Brief, filed another Brief.  Doc. 17.  Although, the "reply" brief was not filed within the time provided for in the Court's August 30, 2011, Order (Doc. 5), there having been no objection by Defendant, Plaintiff's November 14, 2011, Brief (Doc. 14) and his February 24, 2012, Brief (Doc. 17) have both been considered.

For the reasons stated below, there is substantial evidence to support the Commissioner's denial of disability benefits.  Therefore, the Commissioner's decision should be **AFFIRMED**.

1

## I.  Procedural History

Vata filed his application for disability insurance benefits on June 19, 2008.  Tr. 176-184.
The application alleged a disability onset date of June 30, 2004.  Tr. 178.  However, Vata,
through his attorney at the hearing on August 4, 2010, amended his disability onset date to June
16, 2008, because he worked from 2004 until the amended disability onset date of June 16, 2008.
Tr. 29-30.   Vata has alleged disability based on problems with his shoulders, knees, back, right
leg, left wrist, left thumb, feet as well as chest pain, reflux esophagitis, stomach problems, and
respiratory problems.  Tr. 30, 42, 78, 85, 274, 276; Doc. 1-1, p. 1.   After denials by the state
agency (Tr. 75-80, 85-87), Vata requested a hearing (Tr. 90-91) and, on August 4, 2010,
Administrative Law Judge Suzanne A. Littlefield ("ALJ") conducted a hearing.  Tr. 25-74.

In her August 27, 2010, decision (Tr. 8-24) the ALJ determined that Vata had not been
under a disability from the amended alleged onset date of June 16, 2008,[1] through December 31,
2009, his date last insured.  Tr. 17.  Vata requested review of the ALJ's decision by the Appeals
Council and indicated that he was proceeding to represent himself pro se.  Tr. 6-7.  On July 1,
2011, the Appeals Council denied Vata's request for review, making the ALJ's decision the final
decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.  Personal and Vocational Evidence

Vata was born on January 2, 1956, and was 54 years old at the time of the hearing.  Tr.
29, 31.  He has a high school education.  Tr. 29.  He is divorced and the father of two children.
Tr. 477.  He has past relevant work including work as a cleaner, laborer, teacher's assistant,

---

[1] During the hearing, Plaintiff amended his alleged onset date to June 16, 2008.  Tr. 29-30.

pharmacy technician, dialysis technician, nurse's aide and a cook.  Tr. 30, 306-313.  For a period

of time up until his June 2008 amended alleged onset date, Vata had worked at a hotel doing

everything from front desk clerk, to maintenance, to lawn mowing to snow plowing.  Tr. 30, 32.

**B.  Medical Evidence**

On June 30, 2004, Vata suffered an injury while working at Arden Courts, a health care

facility.  Tr. 277, 327, 329.  While using a ladder to change a light bulb Vata missed a step on the

ladder, fell and injured his left knee and left shoulder.  Tr. 277.  The results of a July 1, 2004,

radiological exam of Vata's left shoulder (two views) were unremarkable.  Tr. 365.  Following

the injury, Vata received occupational therapy.  Tr. 329.  On July 30, 2004, Strongsville Medical

Center's treatment notes indicate that Vata reported that his pain had persisted notwithstanding

the physical therapy he received in July 2004.  Tr. 329.   However, physical therapy notes from

seven therapy appointments at Parma Community General Hospital in July 2004 show that, on a

rating scale of 0-10, Vata's pain rating was never greater than a 4 and at some appointments his

pain rating was a 0 or 1.  Tr. 329, 356-362.  A final therapy summary, dated July 27, 2004, states

that:

> On date of last visit, the patient reported a 1/10 in the L shoulder.  The patient
> reported just general soreness from work.  He reported working full duty since
> last week.  The patient saw Dr. Saddleton and patient called back stating he would
> not be returning for any further therapy.

Tr. 367.  Vata's physician discharged him from therapy because the majority of the

therapy goals had been met.  Tr. 367.  Vata was directed to follow up with a physician as

needed and he was to continue with a home program.  Tr. 367.

On September 4, 2004, Vata had an MRI of his left shoulder.  Tr. 363.  The MRI

impression was that there was a "small amount of fluid in the subacromial bursa" and that

"changes [were] consistent with tendonopathy in the rotator cuff."  Tr. 363.  No other abnormalities were noted.  Tr. 363.

On October 1, 2004, Dr. Mary E. Anthony, D.O., saw Vata concerning his work injury. Tr. 586.  Vata reported left medial knee pain which he indicated was worse with weight-bearing activity but denied locking or buckling of the knee or pain at night.  Tr. 586.  He also reported shoulder pain when reaching above and behind.  Tr. 586.  He was continuing to work.  Tr. 586. Dr. Anthony's physical examination revealed no evidence of deformity, swelling, erythema or atrophy with either the knee or shoulder.  Tr. 586.  Dr. Anthony noted that x-rays revealed no evidence of fracture and no bony abnormalities were identified.  Tr. 586.  Dr. Anthony assessed left knee strain and left shoulder impingement; she also suspected a meniscal tear.[2]  Tr. 586.  She ordered an MRI of the left knee.  Tr. 586.  She discussed use of cortisone injections.  Tr. 586. However, Vata refused the treatment.  Tr. 586.  On October 21, 2004, Vata had the MRI of his left knee taken.  Tr. 269.  The MRI impression was posterior medial and anterior lateral meniscal tear with no associated ligamentous or bony injury noted.  Tr. 269.

On November 8, 2004, Dr. Anthony saw Vata again and noted that Vata had full range of motion with his left shoulder but also noted that impingement signs were present.  Tr. 585.  Vata was not working because he had been laid off from work.  Tr. 585.  Vata reported that his knee only occasionally bothered him, but it did not inhibit or impair his day-to-day activities.  Tr. 585. Dr. Anthony assessed left shoulder rotator cuff tendonitis and left knee meniscal tear.  Tr. 585.

---

[2] On January 14, 2008, Dr. Anthony re-examined Vata in connection with this workers compensation injury.  Tr. 432.  As noted, initially in October 2004, Dr. Anthony suspected but could not definitely conclude that the meniscal tear in Vata's left knee was the result of his June 30, 2004, work injury. Tr. 432, 586.  However, upon re-examination of Vata and his medical records, on January 18, 2008, Dr. Anthony concluded that it was her medical opinion that Vata sustained acute meniscal tears as a direct result of his June 30, 2004, injury.  Tr. 432.  She noted that the October 2004 MRI did not reveal evidence of degeneration.  Tr. 432.  Dr. Anthony's January 18, 2008, opinion was submitted in connection with Vata's request that the Bureau of Workers Compensation reconsider the allowance of meniscal tears to his workers compensation claim.  Tr. 432.

Vata refused a cortisone injection in his shoulder.  Tr. 585. Therapy was recommended for his shoulder and, because his knee was only minimally symptomatic at the time, no further treatment was recommended for the knee.  Tr. 585.

From October 14, 2004, until November 18, 2004, Vata received therapy for his left knee and left shoulder through Majka Therapy Services.  Tr. 409-415.  On November 2, 2004, Vata's pain rating for his knee was a 2 out of 10, and his pain rating for his shoulder was a 3 out of 10. Tr. 414.  On November 22, 2004, Vata reported to Dr. Anthony increased pain in his shoulder following physical therapy.  Tr. 584.  Yet, upon examination by Dr. Anthony on November 22, 2004, Vata had full range of motion in his shoulder without pain.  Tr. 584.  Dr. Anthony advised Vata to follow up if his symptoms persisted.[3] Tr. 584.

On February 3, 2005, Dr. Dean W. Erickson, M.D., M.P.H., conducted an independent medical examination in connection with Vata's June 30, 2004, workers compensation injury.  Tr. 423-428, 596-601.  The examination was conducted in connection with the additional allowance of "left rotator cuff tendonitis and left knee meniscal tear" with respect to his allowed conditions of "left knee contusion and left shoulder strain."  Tr. 423.  At the time of the examination, Vata reported no neck pain; occasional left shoulder pain in the anterolateral aspect of his shoulder that he rated as a 3 on a scale of 1-to-10 and he noted that the pain was worse in the morning or following increased activity levels; occasional sensation of decreased range of motion in his left shoulder; no instability symptoms in his left shoulder; rare pain with activity in his left knee; occasional achy sensation in his left knee after prolonged standing; no locking of his left knee; and episodes of swelling in the lateral aspects of his knee.  Tr. 425.  He was treating his shoulder and knee problems with over-the-counter analgesics and Ben-Gay.  Tr. 425.  Dr. Erickson's examination of Vata's left shoulder revealed no tenderness, no gross deformity, only minimal

---

[3] After seeking a second opinion he changed physicians to Dr. Fumich in 2004.  Tr. 432.

positive impingement findings, normal supraspinatus and infraspinatus strength, no evidence of instability or crepitance; and only mild discomfort on isolated supraspinatus stress testing.  Tr. 426.  Dr. Erickson's examination of Vata's left knee revealed no abnormalities, no soft tissue swelling, no effusion, no complaints of tenderness, no crepitance, full range of motion and a normal gait.  Tr. 426.  In conclusion, Dr. Erickson, opined that the left rotator cuff tendonitis was the result of the June 30, 2004, work injury; however, the condition of left knee meniscal tear was not the result of the June 30, 2004, work injury.  Tr. 427.  In support of these findings, Dr. Erickson opined that Vata's left rotator cuff tendonitis was essentially resolved through conservative treatment and that Vata had "absolutely no symptoms or objective findings for left knee meniscal tear" at that time of the examination.  Tr. 427.  Dr. Erickson indicated that the left knee strain was resolved with underlying unrelated minor degenerative meniscal tears.  Tr. 427. He recommended that Vata continue with an independent exercise program and judicious use of over-the-counter anti-inflammatory medication and topical creams as he had been doing.[4]  Tr. 428.

On August 22, 2005, Dr. Paul C. Martin conducted another examination in connection with Vata's June 30, 2004, work injury.  Tr. 420, 603-605.  Vata reported "pain in his left shoulder when lifting, raising his arm, pushing and pulling;"  "intermittent knee pain;" experiencing "moderate pain on a frequent basis" and that "taking aspirin and Flexeril helps to

---

[4] On December 29, 2005, Dr. Robert Mark Fumich, M.D., stated he disagreed with Dr. Erickson's February 3, 2005, report concerning Vata's knee injury. Tr. 463-464.  Dr. Fumich did not agree that Vata's knee problems could be dismissed as degenerative because the October 21, 2004, MRI makes no mention of degeneration of the meniscus and, if the meniscal tears were degenerative, there would be other degenerative change involving the articular cartilage but that was not present in Vata's case.  Tr. 463.  According to Dr. Fumich, Dr. Erickson's recommendation that Vata engage in an independent exercise program would not help heal the meniscal tear and could worsen it.  Tr. 463.  Further, Dr. Fumich indicated that, while anti-inflammatory medication and topical creams might relieve some pain symptoms, they would not relieve the pain and discomfort felt with pivoting and/or squatting activities.  Tr. 463.  Dr. Fumich found there to be a direct causal relationship between Vata's June 30, 2004, work injury and the posterior medial meniscal tear and anterior lateral meniscal tear on Vata's left knee.  Tr. 463.

alleviate the pain;" and "limitations with pushing, pulling and participating in social/recreational activities due to this [the June 30, 2004] injury."  Tr. 420.  Following the exam, Dr. Martin opined that Vata had a 10% lower extremity impairment, which correlated to a 4% whole person impairment, and a 5% upper extremity impairment, which correlated to a 3% whole person impairment.  Tr. 420-422.  Combined, these resulted in Dr. Martin's opinion that Vata's left knee and left shoulder injuries correlated to a total 7% whole person impairment.  Tr. 422.

On December 6, 2005, Dr. Robert Mark Fumich, M.D., examined Vata.  Tr. 620.  Dr. Fumich's examination of Vata's left shoulder showed "full passive, decreased active motion."  Tr. 620.  Dr. Fumich also noted that the MRI showed bursitis and tendonitis and no rotator cuff tear.  Tr. 620.  Vata exhibited "pain on rotation, no crepitation with pain on the subacromial."  Tr. 620.  Dr. Fumich administered a cortisone injection into Vata's left shoulder and scheduled a one-week follow up appointment.  Tr. 620.  Dr. Fumich's examination of Vata's left knee showed "medial joint line tenderness, positive grind, positive pinch flexion, no effusion and no instability."  Tr. 620.  Dr. Fumich opined that Vata had a torn medial meniscus that would require knee surgery.  Tr. 620.  Dr. Fumich indicated that he would proceed to seek additional workers' compensation allowance for the meniscal tear and request authorization for the arthroscopy.  Tr. 620.

On December 13, 2005, Dr. Fumich noted that Vata continued to have medial joint symptoms in the left knee and they were still awaiting the additional allowance so that surgery could be requested.  Tr. 620.  He further indicated that Vata appeared to have a satisfactory response to the cortisone injection in the left shoulder.  Tr. 620.  However, one week later, on December 20, 2005, Vata indicated that the injection had not helped much.  Tr. 621.  Physical therapy for the left shoulder was recommended.  Tr. 621.

On December 28, 2006, Dr. Fumich indicated that Vata had had a left shoulder injection and that everything below the shoulder was fine.  Tr. 621.  However, the shoulder itself hurt with overhead reaching.  Tr. 621.  Vata continued to have medial symptoms in his left knee.  Tr. 621.

On January 16, 2007, Dr. Fumich indicated that the left shoulder had improved since the injection, there was better motion and less pain, but Vata was still having some difficulty with the shoulder.  Tr. 622.  Approval for an MRI was still being sought.  Tr. 622.  Vata continued to have medial symptoms in his left knee, and was scheduled for an independent medical examination.  Tr. 622.

On April 5, 2007, an MRI of Vata's left shoulder was taken based on a history of "[l]eft shoulder pain extending into the arm" and "[d]ecreased range of motion."  Tr. 268, 417, 607. The impression following this MRI was "[p]artial tear of the undersurface of the supraspinatus tendon of the rotator cuff estimated approximately 50%.  No complete tear is seen. A small subacromial spur is also present."  Tr. 268, 417, 607.  There was no evidence of a complete rotator cuff tear.  Tr. 268, 417, 607.

On July 16, 2007, Dr. Kevin Trangle, M.D., M.B.A., conducted an occupational medicine examination and consultation in connection with Vata's workers compensation claim.  Tr. 609. On July 17, 2007, Dr. Trangle completed a report of that examination.  Tr. 609-613.  The purpose of the examination was "determination of extent of impairment, request for treatment and request for additional allowance."  Tr. 609.  The requested claim allowance was "left rotator cuff tear and left shoulder impingement syndrome."  Tr.  609.  Dr. Trangle opined that Vata had

> . . . a partial rotator cuff tear, intrasubstance and not through and through; this is the same thing he had in 2004.  The claim should be allowed for a partial rotator cuff instrasubstance tear.  There is a certain amount of impingement that is caused by such a tear.  When there is any inflammation and particularly when there is a small spur in the acromion, which there is in this case, it can lead to some trapping of tissue.  Trapping of tissue is called impingement syndrome.

* * *

In terms of treatment, he is in need of surgery.  No other therapy will be of any benefit.  He has had physical therapy; he has had injections and they have not helped him.

* * *

He cannot return, at this point in time, to floor care technician work.  He can only work in a capacity where he is not to do any lifting of more than 20 pounds or any work above the mid-chest level.  This opinion as to his work abilities is specifically pertaining to his shoulder condition, without regard to any knee problems that he may or may not have.

Tr. 612-613.

On November 13, 2007, Dr. Kim Stearns, M.D., conducted a medical impairment examination in connection with the June 30, 2004, work injury.  Tr. 277.  The November 13, 2007, report indicates that Vata denied any prior knee or shoulder problems and, although he complained of pain, he had not had surgery.  Tr. 277.  Following the exam, Dr. Stearns opined that, with Vata's limited shoulder mobility, he had a 10% impairment of his whole person[5] and, with his limited knee mobility, he had a 4% impairment of the whole person, giving Vata a combined 14% impairment of the whole person.  Tr. 277, 418.

On March 14, 2008, a right shoulder MRI was conducted.  Tr. 270.  The impressions were supraspinatus tendinopathy and AC joint hypertrophy with muscular impingement.  Tr. 270.  The suprapsinatus tendon was intact with underlying tendinopathy; no tear was seen; the remaining tendons of the rotator cuff were normal in signal and morphology.  Tr. 270.

In April 2008, Vata reported that he was carrying a television down the stairs at work and, when he stepped off the last step, he twisted his knee.  Tr. 544.  On April 13, 2008, Vata

---

[5] As it relates to the shoulder, the report indicates a 17% impairment of his upper extremity or a 10% impairment of the whole person.  Tr. 277.

was seen at Southwest General Health Center's emergency room for mild right knee pain.  Tr.
441.  At that visit, Vata had tenderness in the right knee but normal range of motion.  Tr. 441.
The clinical impression was sprain/strain of the right knee with normal soft tissues, no joint
effusion and no significant arthritic changes present.  Tr. 442, 448.

On November 26, 2008, Vata was seen at Southwest General Health Center and
discharged with a diagnosis of paresthesias/sciatic symptoms, right foot.  Tr. 276.

On December 18, 2008, Vata met with Dr. Rupesh Raina for the purpose of establishing a
new primary care physician.  Tr. 552.  He complained of problems with his right shoulder, right
hip and left hip.  Tr. 552.  Dr. Raina noted positive findings in Vata's back (limitation of motion
and tenderness); positive findings in Vata's right shoulder and right knee (pain with active and
passive ROM, limited ROM, crepitus); negative findings in Vata's left shoulder (no pain with
active ROM, pain with passive ROM, limited ROM or crepitus); normal findings in Vata's hips,
left knee, ankles and wrists except some left thumb tenderness.  Tr. 553.

At a January 2, 2009, appointment with Dr. Raina, Vata indicated that his knee pain was
worse with activity and that his knee catches, gives way, locks, swells and is unstable.  Tr. 505.
Vata also noted that there was no pain at night and no pain in the hip or back.  Tr. 505.  An
examination revealed limited shoulder and elbow motion.  Tr. 506.  Vata walked with a normal
heel to toe gait pattern.  Tr. 506.  Vata's bilateral hip and lumbar spine range of motion was
limited.  Tr. 506.

During a February 2009 follow-up appointment Vata requested that Dr. Raina issue a
disability placard.  Tr. 547.  Dr. Raina's notes indicate that Vata had a "pending case at court for
immigration" and that Vata wanted "an excuse for not traveling outside [of the] US."  Tr. 546.
During the February 2009 appointment, Dr. Raina did issue a handicap placard for one year.  Tr.

547.   However, during February and June 2009 appointments, Dr. Raina noted that Vata was being manipulative and was pressuring Dr. Raina into documenting his file that he was disabled so that he could not be deported.  Tr. 546, 558.  At a November 2009 appointment with Dr. Joseph Sage for treatment of a sore throat, Vata requested that Dr. Sage complete disability paperwork.  Tr. 562.  Dr. Sage noted that Vata had been seen by other doctors at MetroHealth, Drs. Raina and Huang.  Tr. 562.  Dr. Sage took the paperwork but noted that he did not feel comfortable completing the paperwork because he had never seen Vata before.  Tr. 563.

As part of Vata's treatment plan, Dr. Raina referred Vata for physical therapy.  Tr. 525, 531-533.  At his second physical therapy appointment on February 17, 2009, Vata reported a pain rating in his right knee of a 4 out of 10; in his left knee a 6 out of 10, and in his shoulder, an 8 out of 10 with movement.  Tr. 536.  On February 23, 2009, Vata left his appointment before being seen by the therapist.  Tr. 530.

Also, on February 23, 2009, based on Dr. Raina's referral, Vata attended a "new consultation" appointment with Drs. Jeffrey Smith and Dr. Shu-Huang.[6]  Tr. 531-533.   Drs. Smith and Shu-Huang conducted a physical exam during that visit.  Tr. 532.  Their general assessment was that Vata was a "[p]leasant, healthy individual."  Tr. 532.  They more specifically noted that Vata was a "53 year old male with bilateral rotator cuff tendonopathy, bilateral meniscus tears of knees, probably left CMC arthritis, and possible left S1 radiculopathy."  Tr. 533.  They noted that Vata planned to submit a change of physician form with the BWC[7] and that Vata should continue with physical therapy.  Tr. 533.

_____

[6] Dr. Shu-Huang authored the treatment notes in conjunction with Dr. Smith, a resident.  Tr. 533.

[7] On February 23, 2009, Vata signed a BWC "Notice of Change Physician of Record" form wherein he listed Dr. Shu Huang, M.D. Tr. 265.  On that form, the reason listed for the change is "convenience."  Tr. 265.  The form was submitted on or about March 4, 2009.  Tr. 265.

During subsequent physical therapy appointments on February 26, 2009 and March 2, 2009, Vata reported pain ratings of 4 out of 10 in his knees and left shoulder.  Tr. 525, 528.  Vata ambulated with a cane with a non-antalgic gait during most appointments (Tr. 525, 528, 536) and with a slow gait during one appointment.  Tr. 540.  During his appointments, Vata was reminded of the importance of performing exercises at home to help improve his symptoms.  Tr. 526, 529.

On January 20, 2009, a right knee MRI was conducted.  Tr. 271.  The impression was oblique tear of the posterior horn of the medial meniscus.  Tr. 271.

On February 17, 2009, Vata was seen by an occupational therapist for pain in his left hand thumb.  Tr. 535.  Vata was fitted for a splint and he received instructions on the schedule for wearing the splint.  Tr. 535.

On January 14, 2010, Vata was seen at Southwest General Health Center and discharged with a diagnosis of muscular leg pains.  Tr. 275.

On May 14, 2010, Vata was seen at Southwest General Health Center and discharged with a diagnosis of right shoulder pain.  Tr. 279, 591-592.  Normal shoulder radiographs were noted in the May 14, 2010, treatment notes.  Tr. 594.

### *Consultative Examining Physician*

On August 19, 2008, Dr. Mehdi Saghafi, M.D., conducted a physical consultative examination.  Tr. 477-482.  Dr. Saghafi diagnosed Vata with residual strain of the left shoulder; residual torn cartilage of left knee per the October 21, 2004, MRI; residual strain right shoulder and right knee per history; and vertiligo.  Tr. 478.  Based on his examination of Vata, Dr. Saghafi opined that Vata had the capacity to: sit, stand and walk 6-8 hours per day without ambulatory aids; lift and carry 30-40 pounds on a frequent basis and lift and carry 41-100 pounds occasionally; push and pull objects; he is able to manipulate objects; operate hand and foot

controls; drive a motor vehicle and travel; climb stairs; and his speech, hearing memory, orientation and attention were within normal range.  Tr. 478.

### *State Agency Reviewing Physicians*

On September 19, 2008, state agency reviewing physician, Dr. Sai R. Nimmagadda, M.D., reviewed Vata's medical record and completed a physical RFC with a clarification on September 23, 2008.[8]  Tr. 483-491.  Dr. Nimmagadda opined that Vata could lift/carry 50 pounds occasionally and 25 pounds frequently; he could stand, sit and/or walk for 6 hours in an 8-hour workday; and he was not limited in his ability to push and/or pull was not limited except for the lift/carry limits noted.  Tr. 484, 491.  Dr. Nimmagadda opined that Vata could frequently climb ramps or stairs, balance and stoop; he could occasionally kneel, crouch and crawl and could never climb ladders, ropes or scaffolds.  Tr. 485.  Initially, Dr. Nimmagadda opined that Vata was limited to no reaching or lifting overhead with his left shoulder (Tr. 484-486) but, on September 23, 2008, he clarified his opinion, specifically, he indicated that Vata "is NOT restricted to lifting and push/pull with the shoulders.  There would be no weight limitations regarding lifting, etc.  The exertional limitations would apply occasional lifting of 50 lbs and frequently lifting 25 lbs."  Tr. 491.   Dr. Nimmagadda opined that Vata would have no limitations in his handling, fingering or feeling; no visual limitations; no communicative limitations; and no environmental limitations.  Tr. 486-487.  Dr. Nimmagadda indicated that Vata's complaints as to the severity of his pain were disproportionate to what would be expected based on the medical evidence, i.e., Vata alleged severe knee and shoulder pain yet his back and knee exams were completely normal and, although there was an MRI with evidence of a left knee tear, there was no inflammation and his gait was normal.  Tr. 488.  Dr. Nimmagadda did state that Vata's allegation that his pain increases if he lifts or carries things and that his knees

---

[8] The clarification related to the push and/or pull portion of the RFC. Tr. 491.

get stiff if he stays in the same position were consistent with the medical evidence. Tr. 488. Dr. Nimmagadda generally agreed with Dr. Saghafi but suggested lower weight limits than Dr. Saghafi – 50 pounds occasionally rather than 100 pounds and 25 pounds frequently rather than 40 pounds. Tr. 489.

On February 24, 2009, state agency reviewing physician Dr. Gerald Klyop, M.D., completed a physical RFC. Tr. 516-523. Dr. Klyop opined that Vata could lift/carry 50 pounds occasionally and 25 pounds frequently; he could stand, sit and/or walk for 6 hours in an 8-hour workday; and he was not limited in his ability to push and/or pull except for the lift/carry limits noted. Tr. 517. Dr. Klyop opined that Vata could frequently stoop; occasionally climb ramps or stairs, kneel, crouch and crawl and could never climb ladders, ropes or scaffolds. Tr. 518. Dr. Klyop opined that Vata was limited in his ability to reach in all directions (including overhead) but had no limitations in handling, fingering, feeling; no visual limitations; no communicative limitations; and no environmental limitations. Tr. 519-520. Dr. Klyop noted that Vata's statements were credible. Tr. 521. Klyop generally agreed with Dr. Saghafi but suggested lower weight limits than Dr. Saghafi – 50 pounds occasionally rather than 100 pounds and 25 pounds frequently rather than 40 pounds. Tr. 522.

### C. Testimonial Evidence

#### 1. Vata's Testimony

Vata was represented by counsel and testified at the administrative hearing. Tr. 30-49. Vata explained that, at his last job at the hotel, "he did everything in that hotel." Tr. 32. He cut the grass, plowed snow, did maintenance (fixing showers, lights, etc.), and worked the front desk checking guests in and out. Tr. 32-33. He sometimes worked 30 days straight, 24 hours a day

while the owner went on vacation.  Tr. 32.  His normal work day was six to eight hours per day, seven days per week.  Tr. 33.  Vata testified that he never had a day off in four years.  Tr. 33.

He testified regarding his left shoulder problems and confirmed that the doctors have indicated that he has a partial tear of the rotator cuff on his left shoulder.  Tr. 34.  He testified that all different types of movements cause pain in his left shoulder.  Tr. 37.  Vata stated that the pain is a sharp pain, sometimes like an electric shock if he goes too high with the shoulder, and also a burning sensation.  Tr. 37.  He also stated that his thumb hurts as well, not a feeling of numbness but a very unusual feeling.   Tr. 38.

Vata also indicated that, in the winter of 2007, he hurt his right shoulder taking snow off bushes and, by March 2008, his right shoulder was really causing him problems.  Tr. 33-34.   He testified that using his right arm hurts his shoulder.  Tr. 35-36.  He said it hurts to hang clothes up after washing them because he has to lift his arm.  Tr. 36.  He testified that he has pain in his arm if he lifts his hand up but leaves his elbow hanging down.  Tr. 37.  He also stated that it hurts to push, pull or lift things, even a gallon a water.  Tr. 37.

Vata testified that he did feel the described pain in his left shoulder while working at the hotel but he said he usually used his right arm instead of his left.  Tr. 38-39.  He reiterated that it was not until 2007 that he started to have problems with his right shoulder.  Tr. 39.

Regarding his leg pain, Vata testified that, when he injured himself in 2004, he hurt his left knee and left shoulder.  Tr. 39.  He indicated he has two meniscus tears in his left knee and that he feels very big discomfort when walking and pain when he spins on his knee or bears heavy weight.  Tr. 39.  Vata indicated that, in April 2008, he had another workplace accident that caused a problem with his right knee meniscus.  Tr. 39-40.

Vata testified that he received a $23,000.00 workers compensation settlement for injuries to his left side, but not for anything else.[9]  Tr. 41-42.   He testified that, although Dr. Fumich scheduled and recommended left shoulder and knee surgery, he has not had any surgery performed even after he received the workers compensation settlement.  Tr. 42-44. He indicated that his employer did not want to pay for the surgery.  Tr. 43.   Vata testified that his doctors had not recommended surgery for his right side problems.  Tr. 44.  He stated that he was supposed to have an evaluation but that did not occur because the doctor did not want to continue to see him. Tr. 44.

He testified that he also has stomach problems.  Tr. 42.  When eating he feels pain and a burning sensation when he sits and eats, so he eats standing up.  Tr. 42.  Also, he indicated that if he eats in the morning he becomes ill to his stomach.  Tr. 42.

Vata testified that the most comfortable position for him is lying on the floor and he does that three to four times each day for at least a half hour each time.  Tr. 44.   He said he can walk about a mile every day broken down into three sessions; about 200 yards before he has to stop because of discomfort in his knee and leg.  Tr. 44-45.  He also feels discomfort and pain walking up and down stairs but he still takes the stairs because, if he takes an elevator, his knee gets stiff the next day.  Tr. 45.  He indicated he cannot bend at the waist when standing up but can bend up when lying down on his back and can do some exercises.  Tr. 45.  He indicated that he cannot squat and does not attempt to climb ladders.  Tr. 45.  He indicated he has problems grasping items with is left hand and limited ability, depending on the weight, to push and pull things.   Tr. 45-46.  He can button shirts.  Tr. 47.  He testified he can lift 10 pounds with his right hand and

---

[9] The payment was issued on March 6, 2008.  Tr. 196.  According to Vata's testimony, also in March 2008, he really began to experience problems with his right shoulder such that he could not continue to work.  Tr. 33-34.  Vata stopped working on June 16, 2008, but indicates that he should have stopped prior to that but did not because his landlord "blackmailed" him with a few free weeks of rent so he would work a few extra days after his replacement started.  Doc. 17, p. 3.

half that with his left.  Tr. 47.  He said that, if he pushes his left arm up with his right arm, he can

reach over his head with the left arm and it is difficult to reach over his head with his right arm.

Tr. 47-48.  He can reach out with both arms, but it is more difficult with his left arm.  Tr. 48.  He

testified that he had problems for about the last year sleeping due to the problems with his lower

legs.  Tr. 48.  He indicated that his stomach bothers him from the medication that he takes.  Tr.

49.  He indicated he can care for himself, i.e., take care of household chores, shop for himself

and cook for himself.  Tr. 49.

    **2.**    **Vocational Expert's Testimony**

Vocational Expert Gene Burkhammer ("VE") testified at the hearing.  Tr. 68-73.   The

VE testified that Vata's past relevant work could be classified as follows: (1) cook, skilled work

- medium exertional level; (2) nurse's aide, semi-skilled work - medium exertional level; (3)

teacher's aide for special education (adults and students), semi-skilled work - light exertional

level; (4) housekeeping/cleaner, unskilled work - light exertional level; (5) factory laborer,

unskilled work - light exertional level; (6) pharmacy technician, semi-skilled work - light

exertional level; (7) pizza deliverer, unskilled work - medium exertional level; and (8) dialysis

technician, skilled work - light exertional level.  Tr. 69-70.  When asked whether the VE had

incorporated the details from Vata's work at the hotel when considering the classification of his

work as a housekeeper/cleaner, the VE clarified that, with the additional details of the specific

work performed at the hotel, Vata's work could be classified as janitorial, medium exertional, as

well as front desk clerk, light exertional level.  Tr. 71.  The VE testified that there were no

transferable skills from the jobs performed by Vata.  Tr. 72.

The ALJ posed three hypotheticals to the VE.  Tr. 71-73.  First, the ALJ asked the VE

whether an individual of the same age, education and experience as Vata with the ability to

perform a full range of medium work would be able to perform any of Vata's past relevant work.
Tr. 71.  The VE testified, yes, said individual would be able to perform all of Vata's past relevant
work.  Tr. 71.

Second, the ALJ asked the VE whether an individual of the same age, education and
experience as Vata who can lift no more than 20 pounds, has an inability to squat, an inability to
lift overhead with the left shoulder and is unable to climb ladders, ropes or scaffolding would be
able to perform any of Vata's past relevant work.  Tr. 71.   The VE testified that such an
individual would be able to perform work as a teacher's aide, housekeeping/cleaner, pharmacy
technician, dialysis technician and front desk clerk.  Tr. 72.

Third, the ALJ asked the VE whether his testimony would change relative to the second
hypothetical if the individual could lift 25 pounds rather than 20 pounds and the VE indicated
that his testimony would not change.  Tr. 72-73.

Vata's attorney asked the VE whether there would be jobs available to an individual who
was required to lie down four or five times a day for a half hour to an hour each time.   Tr. 73.
The VE testified that there would be no jobs available to such an individual.  Tr. 73.

### 3.    Medical Expert's Testimony

Medical expert Frank Cox, M.D. ("ME"), board certified in internal medicine, testified at
the hearing.  Tr. 50-67, 95-97.  Dr. Cox indicated it was his opinion that Vata had the following
medically determinable impairments: partial tear of the supraspinatus in the left shoulder and
partial tear in the knee meniscus.  Tr. 52.  Dr. Cox testified that it was his opinion that Vata's
impairments did not meet or equal a Listing.[10]  Tr. 54.   He further testified that he did not

---

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P,
App. 1, and describes impairments for each of the major body systems that the Social Security Administration
considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age,
education, or work experience.  20 C.F.R. § 404.1525.

believe that Vata suffered from severe impairments that prevented him from working but he did indicate that Vata's impairments would limit him in some respects.  Tr. 55, 61.  Dr. Cox indicated that Vata would not be able to use his left arm above his shoulder but it was also his opinion that Vata "should be able to lift reasonably, up to his waist" about 25-30 pounds.  Tr. 58, 61.  Also, he indicated that Vata should be able to stand and walk for six hours in an eight hour workday.  Tr. 62.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a

listed impairment, claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her August 27, 2010, decision, the ALJ made the following findings:

1.    Vata met the insured status requirements through December 31, 2009.

2.    Vata had engaged in substantial gainful activity through June 15, 2008; therefore, at the hearing, his alleged onset date of June 30, 2004, was amended to June 16, 2008.

3.    Vata had the following severe impairments: partial tear left rotator cuff, left shoulder impingement syndrome, posterior meniscal tear and anterior meniscal tear left leg, supraspinatus tendinopathy right shoulder, AC joint hypertrophy with muscular impingement, tear of posterior medial meniscus right leg, paresthesias/sciatic symptoms in right foot.   Vata's cough/respiratory condition, nonspecific chest pain, low back pain and left foot pain caused no more than a minimal impact on Vata's ability to perform a wide range of basic work activities and therefore were non-severe impairments.

4.      Vata's impairments did not meet or medically equal one of the listed impairments.

5.      Vata had the residual functional capacity ("RFC") to perform light work, except with only limited squatting, limited overhead reaching with left shoulder, no climbing on ladders, ropes or scaffolds.

6.      Vata was capable of performing past relevant work as a teacher's aide, housekeeping/cleaner, pharmacy technician or front desk clerk.

Based on the foregoing, the ALJ determined that Vata was not under a disability from June 16, 2008, his amended alleged onset date through December 31, 2009, his date last insured. Tr.  13-17.

## V. Parties' Arguments

**A.      Plaintiff's Arguments**

Vata argues that he "has many and serious medical conditions that prevent him to work, even to have a normal life." Doc. 14, p. 8.  He argues that he "is an old person" and it is "hard to find a job, specially [sic] in this economic situation. . ."  Doc. 14, p. 8.  He argues that the ALJ should have subpoenaed Dr. Shu-Huang as requested.  Doc. 14, p. 2.  Finally, he argues that he has "suffered many discrimination and obstruction in his way to build a better life and never achieved."  Doc. 14, p. 8.

**B.      Defendant's Arguments**

In response, the Commissioner argues that the Commissioner's decision that Vata can return to past relevant work and is not disabled is supported by substantial evidence and therefore should be affirmed.  Doc. 16, pp. 9-12.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Here, there is substantial evidence to support the ALJ's decision that Vata can return to his past relevant work as a teacher's aide, housekeeper/cleaner, pharmacy technician and front desk clerk and, therefore, that he is not disabled.  The ALJ's decision demonstrates that the ALJ fully considered the entire record and testimonial evidence.

There are no functional ability reports or medical opinions demonstrating that Vata's impairments deteriorated beginning on June 16, 2008, such that he could no longer work even though he had been engaged in all types of jobs, many of which were strenuous, at the hotel for the four previous years.  Tr. 16, 32-33.  The ALJ considered the workers compensation examination reports showing whole person impairments.  Tr. 17.  She noted that the workers compensation method for determining impairments is not the same of that used for social security disability and further stated that in any event even the workers compensation examining doctors did not rate Vata to be 100% disabled.  Tr. 17, 277, 418, 422.  Furthermore, examining and reviewing physicians were of the opinion that Vata could perform at least light work.  In 2007, Dr. Trangle examined Vata in connection with his work injury and he opined that Vata could "work in a capacity where he is not to do any lifting of more than 20 pounds or any work above the mid-chest level."  Tr. 613.  Dr. Saghafi, the consultative examining physician, opined that Vata could sit, stand and walk for 6 hours in an 8 hour day and could lift between 30 to 100

pounds.  Tr. 478.  The state agency reviewing physicians opined that  Vata could perform medium work (lifting between 25 to 50 pounds) with some postural limitations.  Tr. 483-491, 516-523.   Dr. Cox testified at the hearing that Vata could stand and walk for 6 hours in an 8 hour workday; lift approximately 25 to 30 pounds up to waist level; and perform no above shoulder level work with his left arm.  Tr. 59-62.

The ALJ fully articulated the bases for her finding that Vata's complaints that his medical conditions were so severe that he was unable to work were not credible.  Tr. 16.  She considered the fact that he had refused suggested treatment, and had worked with his impairments and that he described daily activities that were inconsistent with the severity he alleged.  Tr. 16.  Further, the ALJ considered the fact that the treatment received for the impairments had been relatively conservative or routine and not consistent with what one would expect if the impairments were of a disabling nature.  Tr. 17.  As noted in the record, Vata received physical therapy, generally took only over the counter pain medication, did not proceed with recommended surgery notwithstanding a $23,000.00 workers compensation settlement, and at times refused recommended cortisone injections.  Tr. 42-44, 196, 585, 586.

The foregoing demonstrates that the ALJ's RFC of light work with no more than limited squatting and overhead reaching with his left shoulder and no climbing of ladders, ropes or scaffolds is supported by substantial evidence as is the ALJ's Step Four finding that Vata can return to his past work as a teacher's aide, housekeeping/cleaner, pharmacy technician or front desk clerk.[11]  Tr. 15-17.

Plaintiff argues that he "has many serious medical conditions which prevent him to work, even to have a normal life."  Doc. 14, p. 8.  Here, while Plaintiff cites to various pages of the

---

[11] The ALJ's Step Four finding is based on vocational expert testimony and on a comparison of the RFC to the physical and mental demand of the work.  Tr. 17.

transcript in an attempt to show that he is disabled, he fails to demonstrate that the ALJ's

decision is not supported by substantial evidence.  Simply pointing to certain portions of a

medical record as proof of disability is insufficient to establish a basis to reverse the ALJ's

decision.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (even if

substantial evidence or, indeed, a preponderance of the evidence supports a claimant's position, a

reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence

also supports the conclusion reached by the ALJ.").

Plaintiff also argues as grounds for his appeal that he has "suffered many discrimination

and obstruction in his way to build a better life and never achived [sic]" and that he "is an old

person, and even for healthy persons at this age, is hard to find a job, specially in this economic

situation, and Plaintiff has zero resources for living (except Food Stamps, $200.00/month)." Doc.

14, p. 8.  These arguments, while perhaps made to gain sympathy, are made without articulating

how, even, if shown true, they would demonstrate that the ALJ's decision is not supported by

substantial evidence.  Therefore, to the extent that Plaintiff has attempted to assert these

arguments as grounds for reversal, they are without merit.  *See McPherson v. Kelsey*, 125 F.3d

989, 996 (6th Cir. 1997) (agreeing that "[i]t is not sufficient for a party to mention a possible

argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citations

omitted).

Further, to the extent that Vata argues that the ALJ erred by not calling Dr. Shu-Huang as

a medical witness for him at the administrative hearing, the ALJ was not required to call or

subpoena said witness. *See* 20 C.F.R. § 404.950(d).  In a letter to the ALJ, Vata asserted that Dr.

Shu-Huang should be subpoenaed because "she . . . examined me and she stated that I am really

sick, and she asked if I want her to be my physician of record."  Tr. 119.  However, on February

23, 2009, Dr. Shu-Huang indicated that Vata was generally a "[p]leasant, healthy individual."[12]
Tr. 532.  Vata has not provided the Court with evidence of treatment notes or an opinion from
Dr. Shu-Huang regarding Vata's functional limitations.  Further, Vata did not indicate in his
request for a subpoena nor has he demonstrated to this Court why the facts that he intended to
show through Dr. Shu-Huang could not be proven without issuing a subpoena or how such a
witness, who has not offered an opinion as to Plaintiff's functional limitations, could prove that
he is disabled.  *See* 20 C.F.R. § 404.950(d)(2).  Additionally, the records show that, in January
2010, a few months before Vata believed that Dr. Shu-Huang should be subpoenaed as a witness
for him, his attorneys advised him that they had been trying to obtain medical evidence to
support his right shoulder claim and both Dr. Anthony and *Dr. Huang* had responded that they
could NOT support the injury.  Tr. 266.  Moreover, in connection with his disability claim, Vata
signed an attorney fee representation agreement (Tr. 89), was represented by counsel at the
administrative level including the hearing (Tr. 25) and, following an inquiry from the ALJ
regarding the necessity of having Dr. Shu-Huang as a witness, Vata's attorney advised the ALJ
that it was not necessary for Dr. Shu-Huang to appear as a witness.  Tr. 298-299.  Based on the
foregoing, any argument that the ALJ erred by not subpoenaing Dr. Shu-Huang as a medical
witness for Vata is without merit.

### VII.  Conclusion and Recommendation

     For the foregoing reasons, the undersigned recommends that the Commissioner's
decision be **AFFIRMED**.

 Dated:  August 1, 2012

Kathleen B. Burke
United States Magistrate Judge

---

[12] The February 23, 2009, treatment notes also indicate that Vata had "bilateral rotator cuff tendonopathy, bilateral
meniscus tears of knees, probable left CMC arthritis, and possible S1 radiculopathy."  Tr. 533.

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).